# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LE BLEU CORPORATION,

           Plaintiff,

         v.                        **Case No. 17-CV-549**

FEDERAL MFG. LLC and
PRO MACH, INC.,

           Defendants.

## REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Le Bleu Corporation brought this action against defendants Federal Manufacturing LLC, and Pro Mach, Inc., Federal's parent company, relating to the sale by Federal to Le Bleu of an allegedly defective machine used to fill bottles. Le Bleu's complaint contains causes of action for breach of contract, breach of the duty of good faith and fair dealing, breach of implied warranty of merchantability, breach of implied warranty of fitness for particular purpose, breach of express warranty, statutory fraud, and false advertising. (ECF No. 34.) Federal filed a counterclaim against Le Bleu for failure to pay the full purchase price for the machine. (ECF No. 36.)

Federal and Pro Mach moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (ECF No. 57.) They seek summary judgment on all claims asserted by Le Bleu. Federal does not seek summary judgment on its counterclaim. On July 24, 2018, Judge Adelman, before whom the action is pending, referred the defendants' motion to this court for a report and recommendation. (ECF No. 68.)

### FACTS

Headquartered in North Carolina, Le Bleu manufactures and distributes bottled water, juice, and nutraceutical products. (ECF No. 61, ¶ 1.) Le Bleu has sold muscadine grape juice, which it produces at a high temperature, since 2012. (ECF No. 67, ¶ 2.) The company produces and bottles the muscadine grape juice during a short harvest season, which runs for two to four weeks between August and October. (ECF No. 61, ¶ 2.)

In 2014 Le Bleu decided to buy a new filler for its muscadine grape juice bottling line because it was seeking to expand production and its existing filler could only process about 325 bottles per minute. (ECF No. 67, ¶ 9.) Le Bleu sought a filler that could process at least 500 bottles of hot grape juice per minute. (*Id.*)

Garry Partin, a Le Bleu employee who oversees Le Bleu's muscadine grape processing facility, solicited quotations for a new filler from two companies: Federal and Fogg Filler Company. (ECF No. 61, ¶ 4.) Le Bleu and Federal exchanged communications for several months, negotiating and revising the price, model of filler, and particular design specifications. (*Id.*, ¶ 5.) Partin told Federal representatives that Le

Bleu required a filler that could process at least 500 bottles of hot grape juice per minute. (ECF No. 67, ¶ 11.)

Rod Daly, a Federal sales engineer, responded to Partin's request for quotes and met with Le Bleu. (ECF No. 67, ¶ 12.) Daly learned that Le Bleu wanted a filler that could run "550 plus bottles per minute." (*Id.*, ¶ 13.) Daly told Partin that Federal would have "no problem" providing a filler that would process 500 bottles per minute and that Federal could deliver it by the first week of June in time for the 2015 harvest season. (*Id.*)

On December 11, 2014, Daly emailed Partin a proposal, which included a six-page quotation describing the filler model, its features, and pricing terms. (ECF No. 61, ¶ 8.) The quote stated that Federal's 51-valve filler could produce 10-ounce (PET) bottles with a 33 mm screw cap at 500+ bottles per minute. (ECF No. 57-3 at 3.) The email also included an attachment titled, "Terms and Conditions of Sale." (ECF No. 61, ¶ 8.) Section 1 of the Terms and Conditions contains an integration clause which states that "[t]here are no understandings, representations, or warranties of any kind not expressly set forth herein." (ECF No. 57-3 at 8.) Section 8(b) provides that the filler would be free of defects in material and/or workmanship for 180 days from the date of delivery and that Le Bleu's sole remedy for any breach of warranty was that Federal would replace or repair any product found to be defective. (*Id.* at 9.) Section 8(c) excludes recovery of all incidental, consequential or special damages, lost profits or lost opportunity, and

excludes all other warranties other than those set forth in 8(b) of the Terms and Conditions. (*Id.*)

On December 15, 2014, Le Bleu submitted a purchase order to Federal based on the specifications in Federal's December 11, 2014 quote. (ECF No. 67, ¶ 23.) The purchase price for the filler was $650,000, which Le Bleu agreed to pay in the following installments: a 20% down payment at the time of the order, 40% of the purchase price within 60 days of the order, 30% of the purchase price before the shipment date, and the remaining 10% balance within "Net 30 days." (ECF No. 57-3 at 5-7.)

Federal failed to meet the June 5, 2015 delivery date but still demanded that Le Bleu pay the balance of the purchase price that was due before it would ship the filler. (ECF No. 67, ¶ 25.) Le Bleu stated that it would only pay the balance due prior to shipment once the filler was fully assembled and it was given a video of the filler in operation. (*Id.*, ¶ 26.) On June 10, 2015, Eren Vargas, a Federal employee, emailed Partin a video link that demonstrated the filler in operation. (ECF No. 62-12 at 2.) Vargas wrote that the "Federal team is confident in the operation and construction of this machine," and he asked Partin to confirm when the payment installment due prior to shipment would be processed. (*Id.*) Based on these representations, Le Bleu paid the balance due prior to shipment. (ECF No. 67, ¶ 29.)

Federal delivered the filler to Le Bleu on June 15, 2015. (ECF No. 61, ¶ 16.) Upon delivery, the filler was not equipped with the bottle handling equipment, capper

stainless steel parts, or the pedestal sprays that provided water lubrication. (ECF No. 67, ¶¶ 32-33.) Federal held back some parts of the filler's bottle handling equipment for rework. (ECF No. 61, ¶ 17.)

Federal sent one of its field technicians, Rick Stegeman, to Le Bleu in July 2015 to service the filler. (ECF No. 67, ¶ 36.) On July 14, 2015, Stegeman wrote a report that noted eighteen issues with the filler. (*Id.*, ¶ 41.) On August 13, 2015, Federal had Stegeman remove the "entire valve assemblies" from the filler and ship them back to Federal for new valve sleeves and other work. (*Id.*, ¶ 44.) On August 19, 2015, Stegeman prepared another report that noted additional issues with the filler. (*Id.*, ¶ 49.)

In late August 2015 Stegeman assisted during Le Bleu's first production run of the 2015 bottling season. (ECF No. 61, ¶ 19.) On August 26, Stegeman raised concerns with the machine and reported that it ran 10-ounce bottles at only 350 bottles per minute. (ECF No. 67, ¶ 54.) On September 9, Stegeman reported that the filler had to run at 275 bottles per minute because of fifty-three issues. (*Id.*, ¶ 55.) On September 11, Stegeman reported twenty-eight slow-downs and twenty-three stoppages. (*Id.*, ¶ 56.) Le Bleu was unable to run the filler at 500 bottles per minute during the 2015 bottling season. (*Id.*, ¶ 39.) Federal alleges that not all of these issues were caused by equipment supplied by Federal. (*Id.*, ¶¶ 55-56.)

After the 2015 bottling season was completed, Partin emailed Stegeman to report that Le Bleu had made it through the season with only two mishaps: backward caps and

"loss of control of the bottle at the infeed when the bottle is to be set on the platform." (ECF No. 58-2 at 86.) Partin explained that the bottles seemed to "hydro-glide at high speeds (300+) causing the bottle to misalign with the valve, in-turn causing a bottle to pop out or to be lifted crooked and a definite crash at the capper infeed." (*Id.*) Federal offered to install additional bottle control parts on the filler after the 2015 harvest, but Le Bleu apparently did not have bottles available to test the new equipment. (ECF No. 61, ¶ 22.)

In December 2015 Le Bleu contacted Fogg Filler Company about buying a new filler. (ECF No. 61, ¶ 23.) Federal alleges Le Bleu wanted the Fogg filler to replace the Federal filler, but Le Bleu contends that it wanted the Fogg filler to add a second line of production. (*Id.*) Le Bleu made its first payment for the Fogg filler in January 2016. (*Id.*, ¶ 24.)

In February 2016 Federal sent a team to Le Bleu to attempt to fix the Federal filler. (ECF No. 67, ¶ 61.) Federal's team replaced an end feed cam and star wheel. (*Id.*, ¶ 62.) The new end feed cam was installed to fix the filler's hydro-gliding problem. (*Id.*) Federal's team was able to run the filler at 500 bottles per minute using cold water. (ECF No. 61, ¶ 28.)

On April 4, 2016, Le Bleu informed Fogg that it would run the Federal filler during the fall 2016 bottling season and would not install the Fogg filler until the 2017 season. (ECF No. 61, ¶ 30.) However, Le Bleu asked Fogg to deliver a new cap

sorter/elevator to replace a piece of legacy equipment that Le Bleu had been using on the Federal filler. (*Id.*, ¶ 31.)

In September 2016 Federal technicians Steve Bartkowski and Curtis Harvey visited Le Bleu to polish the filler's valves. (ECF No. 67, ¶ 65.) Bartkowski noticed scoring or scratches on the valves, which caused Federal to replace all fifty-one metal valves with valves that had rubber diaphragms. (*Id.*, ¶¶ 65-66.) Le Bleu was concerned that metal shavings could end up in its product. (*Id.*, ¶ 66.)

During the 2016 bottling season Le Bleu continued to have problems with the Federal filler. (ECF No. 67, ¶ 68.) On September 6, the filler suffered a bearing and valve failure. (*Id.*) Harvey's September 9-10 trip report noted problems with the machine's bearings, valves, filler cam, chute elevator, and controls. (*Id.*) On September 16, Partin reported broken springs, nuts off the cam rollers, and transfer column seizure. (*Id.*, ¶ 69.)

Le Bleu ran the Federal filler for 17 days during the 2015 harvest and for 15 days during the 2016 harvest. (ECF No. 67, ¶ 72.) After the 2016 season Le Bleu attempted to return the filler to Federal in exchange for a full refund. (*Id.*, ¶ 73.) Federal refused. (*Id.*)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it "might affect the

outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## ANALYSIS

### I. Term and Conditions

As a preliminary matter the court must determine whether the Terms and Conditions of Sale attached to Federal's quote are part of the agreement between the parties. Le Bleu argues that the Terms and Conditions are not part of the agreement because neither party signed the quote or the Terms and Conditions. (ECF No. 63 at 13.) Defendants argue that District Judge Catherine C. Eagles of the United States District Court for the Middle District of North Carolina previously rejected that same argument by Le Bleu when she ordered that this action be transferred to this district, and her ruling is the law of the case. (ECF No. 66 at 2.) Judge Eagles stated:

> Federal sent Le Bleu a price quote for a filler machine along with its Terms and Conditions of Sale, which included a forum selection clause. Le Bleu

returned a signed purchase order for the filler machine at the agreed-upon price without any objections to the Terms and Conditions. By doing so, Le Bleu accepted the Terms and Conditions as the contract terms for its purchase of the filler. Even if it did not accept via the purchase order, Le Bleu accepted the Terms and Conditions by accepting the filler and not timely rejecting delivery.

(ECF No. 18 at 2.)

The Court of Appeals for the Seventh Circuit has held that

[t]he authority of a district judge to reconsider a previous ruling in the same litigation, whether a ruling made by him or by a district judge previously presiding in the case, including (because the case has been transferred) a judge of a different court, is governed by the doctrine of the law of the case, which authorizes such reconsideration if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous.

*Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006) (internal citations omitted). Le Bleu has not identified any compelling reason for reconsidering Judge Eagles's conclusion. Therefore, the law of the case doctrine precludes Le Bleu from re-arguing that the Terms and Conditions are not part of the parties' agreement.

## II.     Breach of Warranty Claims

Defendants move for summary judgment on Counts III (breach of implied warranty of merchantability), IV (breach of implied warranty of fitness for particular purpose), and V (breach of express warranty) of the amended complaint. In moving for summary judgment on Counts III and IV, defendants argue that "[t]he Terms and Conditions … expressly exclude any implied warranties [of] merchantability and fitness for a particular purpose." (ECF No. 57 at 12.)

A seller may expressly exclude the implied warranties of merchantability and/or fitness for a particular purpose as long as the disclaimer is (1) in writing, (2) conspicuous, (3) specifically mentions merchantability, and (4) clearly states that the implied warranties are excluded. Wis. Stat. § 402.316(2).

Section 8 of the Terms and Conditions of Sale states in relevant part: "SELLER MAKES OR ASSUMES NO OTHER WARRANTIES OR GUARANTEES WHATSOEVER, WHETHER EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE." (ECF No. 57-3 at 9.) Le Bleu does not contest that Section 8's disclaimer of implied warranties is in accordance with the requirements of Wisconsin Statute § 402.316(2). Therefore, the court will recommend that defendants' motion for summary judgment be granted as to Counts III and IV of the amended complaint.

Count V alleges that Federal expressly warranted that the filler would be able to process 500 or more bottles per minute. (ECF No. 34, ¶ 92.) In moving for summary judgment on Count V, defendants argue that it "is entirely based on an alleged 'express warranty' that does not exist" because "Federal expressly warranted only that the Filler would be free of defects in material or workmanship, not that the Filler would operate at a particular speed for a specific amount of time." (ECF No. 57 at 14.) Defendants also argue that, "[e]ven if the express warranty included the rate quoted on the proposal, no factual dispute as to whether Federal breached that warranty exists." (ECF No. 66 at 4.)

Defendants further argue that Le Bleu cannot rely on any verbal or written communications outside of the agreement regarding the speed of the filler because the Terms and Conditions contain "an integration clause which expressly states that there are no warranties of any kind other than those expressly set forth therein." (ECF No. 57 at 14; *see* ECF No. 57-3 at 8.)

In response, Le Bleu argues that Federal's quote "expressly warrants that the filler will process '500+ bottles per minute'" (*see* ECF No. 57-3 at 3) and that "Federal made multiple representations to Le Bleu about the filler before and after Le Bleu contracted with it." (ECF No. 63 at 13-14.) As for the integration clause, Le Bleu argues that it does not bar Federal's express warranty about the filler's ability to process a minimum of 500 bottles per minute because "the integration clause 'states that there are no warranties of any kind *other than those expressly set forth herein*.'" (*Id.* at 14.) (Emphasis in original.) Because the express warranty was set forth in the quote itself, it is not barred by the integration clause.

Wisconsin Statute § 402.313 explains how an express warranty may be created, stating in relevant part:

(1) Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Whether an express warranty has been created by a seller's statements is typically a question for the factfinder. *Ewers v. Eisenzopf*, 88 Wis. 2d 482, 489, 276 N.W.2d 802, 805 (1979).

The quote Federal provided to Le Bleu, which Le Bleu accepted, explicitly stated that a 10-ounce (PET) bottle with a 33 mm screw cap would be able to produce 500+ bottles per minute. (ECF No. 57-3 at 3.) Construing the evidence in favor of Le Bleu, a reasonable factfinder could conclude that Federal's representation in the quote that the filler would produce 500 or more bottles per minute created an express warranty that the filler would conform to that representation. *See* Wis. Stat. 402.313(1)(b).

In their reply brief defendants argue that "[e]ven if the specification contained in the proposal, which listed 'Bottles per Minute' of '500+' for a ten-ounce bottle was considered to be part of the express warranty, it is undisputed that the Filler ran at 500 bottles per minute, both in February 2016 and September 2016. (ECF No. 66 at 3-4.) Le Bleu alleges that Federal's team ran the filler at 500 bottles per minute *using cold water*, but was never able to run the filler at 500 bottles per minute using Le Bleu's muscadine juice, which is heated to 185 degrees Fahrenheit. (ECF No. 61, ¶¶ 28, 34.) Construing the evidence in favor of Le Bleu, a genuine issue of material fact exists as to whether

Federal breached the alleged express warranty notwithstanding its ability to run the filler at 500 bottles per minute on two occasions using cold water.

The integration clause included in the Terms and Conditions states that, "[t]here are no understandings, representations, or warranties of any kind not expressly set forth herein." (ECF No. 57-3 at 8.) This clause is ambiguous as it is unclear whether the phrase "no … warranties of any kind not expressly set forth herein" refers "only to the warranties set forth in the Warranty provision of the Terms and Conditions of Sale or to those set forth anywhere in the entire proposal." *AEP Industries Inc. v. Thiele Techs. Inc.*, No. 16-C-391, 2016 WL 4591902, at *6 (E.D. Wis. September 2, 2016); *see* Wis. Stat. § 402.316(1) ("Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but … negation or limitation is inoperative to the extent that such construction is unreasonable."). As a result, the integration clause does not necessarily bar a factfinder from finding in favor of Le Bleu on Count V if it concludes that Federal's representation of at least 500 bottles per minute created an express warranty.

In sum, Le Bleu's breach of express warranty claim does not fail as a matter of law. Therefore, the court will recommend that defendants' motion for summary judgment be denied as to Count V of the amended complaint.

### III.  Damages

In its amended complaint Le Bleu requests that the court award, in part, "compensatory, incidental, and consequential damages in an amount to be determined at trial [.]" (ECF No. 34 at 15.) Defendants claim that the contract precludes all of the damages Le Bleu seeks in Counts I through V by expressly excluding them in the Terms and Conditions. (ECF No. 57 at 14-16.) Defendants argue that the Terms and Conditions disclaimed any liability for incidental, consequential, or special damages or lost profits, and limited Le Bleu's remedy in the event of a breach to repair or replacement. (*Id.* at 14.)

In response, Le Bleu argues that the limited remedy of repair or replacement failed of its essential purpose—or at least genuine issues of material fact exist as to whether it did. Therefore, it is entitled to other Uniform Commercial Code (UCC) remedies under Wisconsin Statute § 402.719(2), including incidental, consequential and/or special damages or lost profits. (ECF No. 63 at 14-18.)

Wisconsin Statute § 402.719 allows parties to contractually modify or limit the remedies that are available as a result of a breach of contract. That statute specifically allows parties to limit the remedies from a breach of contract to repair or replacement:

> The agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, *as by limiting the buyer's remedies … to repair and replacement of nonconforming goods or parts*[.]

Wis. Stat. § 402.719(1)(a) (emphasis added). However, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose," other remedies in the UCC remain available. Wis. Stat. § 402.719(2). That includes the right to recover incidental and/or consequential damages under Wisconsin Statute § 402.715. *See Murray v. Holiday Rambler*, 83 Wis. 2d 406, 430, 265 N.W. 2d 513, 525 (1978).

"The limited remedy of repair or replacement of defective parts fails of its essential purpose whenever, despite reasonable opportunity for repair, the goods are not restored to a nondefective condition within a reasonable time, whether or not the failure to do so is willful." *Murray*, 83 Wis. 2d at 424. A reasonable time under the UCC "depends on the nature, purpose, and circumstances of the action." Wis. Stat. § 401.205(1).

In *Murray*, the plaintiffs purchased a motorhome that had problems from the beginning. 83 Wis. 2d at 411-12. The plaintiffs repeatedly had to return it to an authorized dealer for repairs and adjustments. *Id.* at 412. About eight months after buying the motorhome the plaintiffs informed the dealer that they were revoking acceptance of the motorhome. *Id.* at 413. However, the warranty limited the buyer's remedies to repair or replacement of defective parts and disclaimed all other obligations, either express or limited. 83 Wis. 2d at 418.

Nevertheless, the court concluded that

[w]here the seller is given reasonable opportunity to correct the defect or defects, and the vehicle nevertheless fails to operate as should a new

15

vehicle free of defects, the limited remedy fails of its essential purpose. The buyer may then invoke any of the remedies available under the UCC, including the right to revoke acceptance of the goods, under [Wis. Stat. § 402.608].

*Id.* at 421 (internal citations omitted). The court found "ample credible evidence to support the jury's finding that the defendants had failed to provide the plaintiffs with a motorhome substantially free of material defects within a reasonable time." 83 Wis. 2d at 422. As such, the court determined that the plaintiffs were entitled to avail themselves of other UCC remedies and upheld the jury's determination that the plaintiffs had cause to revoke their acceptance of the motorhome. *Id.* at 421-426.

Similar to the warranty in *Murray*, the Terms and Conditions of the agreement between Le Bleu and Federal expressly limit Le Bleu's remedy in the event of a breach to repair and replacement: "As Buyer's *sole remedy* for any breach of this Agreement by Seller, Seller shall replace or repair any products found to be defective[.]" (ECF No. 57-3 at 9 (emphasis added).) The agreement also expressly excludes any incidental, consequential, or special damages:

THE WARRANTIES SET FORTH IN THE FOREGOING PROVISIONS OF THIS SECTION ARE LIMITED TO THEIR PRECISE TERMS AND PROVIDE EXCLUSIVE REMEDIES, EXPRESSLY IN LIEU OF ALL OTHER REMEDIES. SELLER DISCLAIMS AND SHALL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, OR LOST PROFITS OR LOST OPPORTUNITY, ARISING FROM OR RELATED TO THIS AGREEMENT, ANY ACTUAL OR ALLEGED BREACH HEREOF, OR THE PRODUCTS.

(*Id.* at 9.)

Le Bleu claims the limited remedy failed of its essential purpose because it, "similar to the buyers in *Murray*—encountered a litany of material defects with the [filler], and despite repeated attempts at repair, Federal never got the [filler] to run as promised." (ECF No. 63 at 18.) Le Bleu contends that it experienced problems with Federal's filler starting the day it was delivered, and those problems continued throughout the two seasons Le Bleu used Federal's filler. Although Federal repeatedly attempted to fix the filler, it never got the filler to run as it should.

Construing all of the evidence in favor of Le Bleu, genuine issues of material fact exist as to whether the limited remedy set forth in the contract failed of its essential purpose and, thus, whether other UCC remedies must be made available to Le Bleu. Therefore, the court will recommend that defendants' motion for summary judgment be denied as to Counts I, II, and V of the amended complaint. The court would make the same recommendation as to Counts III and IV. However, as discussed above, the court has already stated that it will recommend that defendants' motion for summary judgment be granted as to Counts III and IV on the ground that the Terms and Conditions expressly exclude any implied warranties of merchantability and fitness for a particular purpose.

## IV. Revocation

In Count I (Breach of Contract) of its amended complaint, Le Bleu alleges it "revoked its acceptance of the defective filler machine within a reasonable time after

discovering its defects." (ECF No. 34, ¶ 62.) In moving for summary judgment on this count, defendants argue that "Le Bleu waived its right to revoke its acceptance [of] the Filler by using it for two years." (ECF No. 57 at 16.) In response, Le Bleu argues that it "kept and used the filler to give Federal ample opportunity to make it operate within its promised specifications." (ECF No. 63 at 21.)

The Terms and Conditions expressly state that the filler "shall be deemed to be accepted by Buyer unless Buyer notifies Seller otherwise within 10 days after delivery." (ECF No. 57-3 at 8.) Notwithstanding this provision, Wisconsin Statute § 402.608 allows a buyer to revoke acceptance of a "commercial unit whose nonconformity substantially impairs its value to the buyer" when the buyer has accepted the goods "on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured." Wis. Stat. § 402.608(1)(a). The buyer must revoke "within a reasonable time after the buyer discovers … the ground for [revocation] and before any substantial change in condition of the goods which is not caused by their own defects. [Revocation] is not effective until the buyer notifies the seller of it." Wis. Stat. § 402.608(2). A reasonable time "depends on the nature, purpose, and circumstances of the action," Wis. Stat. § 401.205(1), and is usually a question for the factfinder, *see Murray*, 83 Wis. 2d at 428; *Viking Packaging Techs., Inc. v. Vassallo Foods, Inc.*, 337 Wis. 2d 125, 142-43, 804 N.W.2d 507, 516 (Ct. App. 2011).

Le Bleu alleges that the filler was missing "critical" parts when it arrived in June 2015. (ECF No. 63 at 5.) It also alleges that it was "continuously in touch with Federal and gave it every chance to make the machine work properly," and that "Federal continued to replace crucial components on the filler well into the 2016 harvest." (*Id.* at 21-22.) Le Bleu further alleges that it only used the filler for 32 days over the course of two years (*Id.* at 21), and that after the 2016 harvest it attempted to return the filler (*Id.* at 11).

Construing all of the evidence in favor of Le Bleu, a reasonable factfinder could conclude that Le Bleu accepted the filler on the reasonable assumption that its nonconformities would be seasonably cured, and, when they weren't, Le Bleu revoked acceptance within a reasonable time. As a result, the court will recommend that defendants' motion for summary judgment be denied as to Count I of the amended complaint.

## V.    Statutory Fraud

In Count VI of its amended complaint Le Bleu alleges that Federal intentionally made false representations regarding the filler's capabilities, in violation of Wisconsin Statutes §§ 895.446 and 943.20(1)(d). (ECF No. 34, ¶¶ 99-110.) The elements of Le Bleu's claim are:

> (1) that the defendant made false representations to the plaintiff, (2) that the defendant knew that these representations were false, (3) that the defendant made the representations with the intent to deceive and to defraud the plaintiff, (4) that the plaintiff was deceived by the

19

representations, (5) that the plaintiff was defrauded by the representations, and (6) that the defendant obtained money through the sale of property to the plaintiff.

*Ferris v. Location 3 Corp.*, 337 Wis. 2d 155, 163, 804 N.W.2d 822, 826 (Ct. App. 2011).

"'False representation' includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme." Wis. Stat. § 943.20(d).

In moving for summary judgment defendants argue that Le Bleu's statutory fraud claim fails for two reasons: (1) Wisconsin's economic loss doctrine bars Le Bleu's claim as a matter of law because the alleged misrepresentations regarding the filler's performance are interwoven with the contract; and (2) the representations about the filler's performance were statements regarding future performance, which cannot form the basis of a statutory fraud claim. (ECF No. 57 at 19.)[1]

### A. Wisconsin's Economic Loss Doctrine

The economic loss doctrine "'is a judicially created doctrine that seeks to preserve the distinction between contract and tort.'" *Below v. Norton*, 310 Wis. 2d 713, 726, 751 N.W.2d 351, 358 (2008) (quoting *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 276 Wis. 2d 361, 369, 688 N.W.2d 462, 466 (2004) (citation omitted)). "[I]ts purpose is to preserve the distinction between contract and tort by requiring transacting parties to pursue only

_____

[1] In their reply brief, defendants argue for the first time a third basis for granting summary judgment on Le Bleu's statutory fraud claim: that the alleged statements that form the basis of the claim were not false. (ECF No. 66 at 11.) Defendants' failure to raise this argument in their initial brief means that they have waived it. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) ("arguments raised for the first time in a reply brief are deemed waived").

their contractual remedies when asserting an economic loss claim." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 283 Wis. 2d 555, 579, 699 N.W.2d 205, 216 (2005) (citing *Cease Elec. Inc.*, 276 Wis. 2d at 372)).

The Wisconsin Supreme Court, in *Stuart v. Weisflog's Showroom Gallery, Inc.*, 308 Wis. 2d. 103, 124, 746 N.W.2d 762, 773 (2008), stated that it was "satisfied that the [economic loss doctrine] cannot apply to statutory claims." Relying on *Stuart*, the Wisconsin Court of Appeals concluded that the economic loss doctrine does not preclude claims under Wisconsin Statutes §§ 895.446 and 943.20(1)(d). *Ferris*, 337 Wis. 2d at 166. As such, the economic loss doctrine does not bar Le Bleu's statutory fraud claim.

**B. Promise of Future Performance**

An action for fraud cannot be based on future events or facts not in existence when the representation was made, or on unfulfilled promises. *Schurmann v. Neau*, 240 Wis. 2d 719, 727, 624 N.W.2d 157, 161 (Ct. App. 2000); *see also Hartwig v. Bitter*, 29 Wis. 2d 653, 657, 139 N.W.2d 644, 647 (1966). An exception to this rule is when the promisor has a present intention not to perform when making the promise. *Hartwig*, 29 Wis. 2d at 657.

Le Bleu's statutory fraud claim is based on two allegedly false representations. First, Le Bleu alleges that Daly's email on December 11, 2014, stating that the filler should be "very close to 500 bpm on the 10 oz bottle," was false. (ECF No. 34, ¶ 101; *see*

ECF No. 62-8 at 2.) This statement cannot be a basis for Le Bleu's statutory fraud claim. Federal had not yet manufactured Le Bleu's customized filler, and Le Bleu does not allege that Federal had a present intention not to perform when Daly made this statement. Le Bleu seems to concede as much, not even discussing Daly's statement in its opposition to the defendants' motion.

The second representation that forms a basis for Le Bleu's statutory fraud claim is an email from Eren Vargas, a Federal employee, on June 10, 2015, which stated that the "Federal team is confident in the operation and construction of this machine to your application." (ECF No. 34, ¶ 102; *see* ECF No. 62-12 at 2.) Embedded within the email was a video link that demonstrated the operation of Le Bleu's filler. (ECF No. 62-12 at 2.) Le Bleu apparently interpreted the statement that the filler will operate "to your application" to mean at the speed it needed—that is, at least 500 bottles per minute. Defendants argue that Vargas's statement regarding Federal's confidence in the operation and construction of the filler related to the future performance of the filler. (ECF No. 66 at 11-12.) However, the context of the email suggests that Vargas's statement was made about the current, and not future, performance of Le Bleu's filler.

Defendants also argue that Vargas's email "cannot serve as the basis for fraud because Le Bleu did nothing in reliance on the video." (ECF No. 66 at 12.) Specifically, they argue that Le Bleu had already sent in the purchase order for the filler as of the time this representation was made. (*Id.*) Le Bleu alleges that it relied on Vargas's

representation that the filler was ready for shipment when it paid the balance that was due prior to shipment. (*See* ECF No. 62-26 at 3.) As such, the second representation that forms the basis of Le Bleu's statutory fraud claim does not fail as a matter of law. Therefore, the court will recommend that defendants' motion for summary judgment be denied as to Count VI of the amended complaint.

## VI. False Advertising

Count VII (false advertising) of Le Bleu's amended complaint alleges that "Federal advertised the filler machine it sold to Le Bleu as capable of processing 500+ bottles per minute." (ECF No. 34, ¶ 112.) That representation "was untrue, deceptive, and misleading." (*Id.*, ¶ 114.) According to Count VII, that conduct "constitutes a violation of Wis. Stat. § 100.18." (*Id.*, ¶ 116.)

To prevail on a false advertising claim under Wisconsin Statute § 100.18, Le Bleu must prove three things: (1) Federal made a representation to "the public" with the intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation caused Le Bleu a pecuniary loss. *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.*, 301 Wis. 2d 109, 121-22, 732 N.W.2d 792, 798 (2007). False advertising claims are "limited to representations that were made prior to the acceptance of the offer to purchase" because "[t]he purpose of § 100.18 is aimed at untrue, deceptive, or misleading statements made to induce certain actions." *Kailin v. Armstrong*, 252 Wis. 2d 676, 710, 643 N.W.2d 132, 149 (Ct. App. 2002).

In moving for summary judgment defendants make three arguments: (1) Le Bleu did not purchase the filler in response to advertisements made to the public (ECF No. 57 at 22-24); (2) Federal did not make a false statement (ECF No. 66 at 13); and (3) "[t]he integration clause in the Terms and Conditions bars Le Bleu from pursuing its false advertising claim" (ECF No. 57 at 24).

## A. "The Public"

Defendants argue that "the alleged misrepresentations were not made 'to the public' and Wis. Stat. § 100.18 cannot apply." (ECF No. 57 at 24.) Although Wisconsin Statute § 100.18 does not define when someone is a member of "the public," the Wisconsin Supreme Court has held that "a plaintiff remains a member of 'the public' unless a particular relationship exists between him or her and the defendant." *K & S Tool Die Corp.*, 301 Wis. 2d at 125. The determination of whether a "particular relationship" exists "will depend upon its own peculiar facts and circumstances." *Id.* (citation omitted).

Federal argues that Le Bleu was not a member of "the public" because "Partin contacted Federal—not the other way around—based on his previous experience" of working for Federal for approximately ten years. (ECF No. 66 at 13.) However, whether that creates a "particular relationship" between Le Bleu and Federal such that Le Bleu was not a member of the public when Federal made representations to it about the capabilities of the filler is a disputed question of material fact.

### B. False Statement

In their reply brief defendants argue that "Le Bleu offers no evidence that Federal made a false statement." (ECF No. 66 at 13.) Defendants contend that the filler ran at 500 bottles per minute in February and September 2016, but Le Bleu contends that the filler never ran at 500 bottles per minute using its muscadine juice. (ECF No. 61, ¶¶ 28, 34.) Construing all of the evidence in favor of Le Bleu, a genuine issue of material fact exists as to whether Federal made a false statement regarding the filler's capability to run at 500 bottles per minute using muscadine juice.

### C. Integration Clause

To support its argument that the Terms and Conditions bar Le Bleu's false advertising claim, Federal relies on the holding in *Peterson v. Cornerstone Prop. Dev., LLC.*, 294 Wis. 2d 800, 720 N.W.2d 716 (Ct. App. 2006). *Peterson* involved a contract for the purchase of a condominium, which the plaintiff claimed was not in the condition represented by the seller. *Id.* at 806-08. The plaintiff brought a false advertising claim against the seller, alleging the seller made representations and omissions that were untrue, deceptive, or misleading. *Id.* at 809. The seller argued that the false advertising claim was barred by the integration clause in the parties' contract. *Id.* at 816.

The integration provisions in the contract in *Peterson* stated in pertinent part: the offer, including any amendments, constituted the "entire agreement of the Buyer and Seller[;]" "[a]ll prior negotiations and discussions have been merged into this Offer[;]"

"Seller has made no representations other than written in this offer and attached documents concerning the property[;]" and "*[Buyer] has not relied on any representations made by the Seller in entering into the [offer to purchase]*." 294 Wis. 2d at 820 (emphasis added). The court found that the integration clause barred the plaintiff's false advertising claim because it "specifically disclaim[ed] the [plaintiff's] right to rely on any alleged fraudulent misrepresentations." *Id.* at 820-22.

Here, the integration clause states, "This Agreement constitutes the entire agreement between the parties …. There are no understandings, representations, or warranties of any kind not expressly set forth herein." (ECF No. 57-3 at 8.) The integration clause does not, as the integration clauses in *Peterson* did, specifically disclaim Le Bleu's right to rely on alleged fraudulent misrepresentations. *See, e.g., Am. Orthodontics Corp. v. Epicor Software Corp.*, 746 F. Supp. 2d 996, 998 (E.D. Wis. 2010) ("The problem with defendant's argument is that, unlike the integration clauses at issue in *Peterson*, the integration clauses at issue in the present case do not specifically disclaim plaintiff's right to rely on defendant's fraudulent misrepresentations."); *C & M Hardware, LLC v. True Value Co.*, 348 Wis. 2d 761, 833 N.W.2d 872 (Ct. App. 2013) (unpublished) ("Unlike the plaintiff in *Peterson*, C & M did not disclaim liability for misrepresentation[.]"); *Berard v. Schertz*, 313 Wis. 2d 523, 756 N.W.2d 478 (Ct. App. 2008) (unreported) ("However, unlike *Peterson*, the integration clause here cannot be read to

disclaim fraudulent misrepresentations.") As such, the integration clause does not bar Le Bleu's false advertising claim under Wisconsin Statute § 100.18.

In sum, Le Bleu's false advertising claim does not fail as a matter of law. Therefore, the court will recommend that defendants' motion for summary judgment be denied as to Count VII of the amended complaint.

## VII. Piercing the Corporate Veil

Le Bleu seeks to pierce the corporate veil between defendants Pro Mach, Inc., and Federal, a wholly-owned subsidiary of Pro Mach. (ECF No. 34, ¶¶ 7-20.) In order to pierce the corporate veil, the plaintiff must prove:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Consumer's Co-Op of Walworth County v. Olsen*, 142 Wis. 2d 465, 484, 419 N.W.2d 211, 217-18 (1988) (internal citation and footnote omitted).

Le Bleu alleges that "Federal has repeatedly disregarded corporate formalities" and that "Pro Mach has exerted control over Federal's finances, business policies, and business practices such that Federal had no separate will of its own." (ECF No. 61 at 30.)

However, Le Bleu has not presented any evidence to support its claim that Pro Mach used Federal to commit a fraud or a wrong or that Pro Mach's control over Federal was the proximate cause of Le Bleu's injury. As such, Le Bleu's alter ego claim fails as a matter of law, and the court will recommend that Pro Mach, Inc., be dismissed from this action.

**IT IS THEREFORE RECOMMENDED** that defendants Federal Manufacturing, LLC, and Pro Mach, Inc.'s motion for partial summary judgment (ECF No. 57) be **GRANTED in part AND DENIED in part**. The motion is granted as to Counts III and IV of the amended complaint, and the motion is denied as to Counts I, II, V, VI, and VII.

**IT IS FURTHER RECOMMENDED** that defendant Pro Mach, Inc., be **dismissed** from this action.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Civ. P. 72(b)(2) whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 10th day of October, 2018.

WILLIAM E. DUFFIN

U.S. Magistrate Judge